UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**05 - 21249**
**CIV-MARTINEZ**

CASE NO. _____       MAGISTRATE JUDGE
                                        BANDSTRA

IN RE:  Request from Republic of Panama
Pursuant to the Treaty Between the United States
of America and the Republic of Panama
on Mutual Assistance in Criminal Matters
in the Matter of Jorge Vasquez Gallego

_____/

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ORDER

The United States is seeking an Order appointing a Commissioner to collect evidence requested by Argentina in its attached Treaty Request made pursuant to the <u>Treaty between the United States of America and the Republic of Panama on Mutual Assistance in Criminal Matters,</u> signed on April 11, 1991, and entered into force on September 6, 1995 [hereinafter referred to as "the Treaty"].  A treaty constitutes the law of the land.  U.S. Const. Art.VI.  The provisions of a treaty have equal footing with acts of Congress and are binding on the courts.  <u>Asakura v. City of Seattle, Washington,</u> 265 U.S. 332, 341 (1924); <u>United States v. The Peggy,</u> 5 U.S. 103 (1801).  To the extent that the provisions of a treaty are inconsistent with a preexisting statutory provision, the treaty supersedes the statute.  <u>United States v. Erato,</u> 2 F.3d 11, 15-16 (2d Cir. 1993).

A.      <u>The Treaty</u>

The United States and the Republic of Panama entered into the Treaty for the purpose of promoting mutual legal cooperation in criminal matters.  The Treaty obliges each state to provide assistance to the other in investigations of offenses covered under the Treaty and in court proceedings related to such offenses.  Article 1(1).  The assistance includes interviews and depositions of witnesses, production of documents and other things, and asset freezes.  Article

1(2); see <u>Barr v. U. S. Department of Justice</u>, 645 F. Supp. 235, 237 (E.D.N.Y. 1986), <u>aff'd</u>, 819 F.2d 25 (2d Cir. 1987).

B.      Use of the Treaty to Execute Requests for Assistance

In executing Republic of Panamanian requests, the Treaty obligates the courts to follow its domestic law and procedures except to the extent that the Treaty provides otherwise.  The Treaty states, at Article 1 (4):

> All requests under this treaty shall be executed in accordance with and subject to the limitations imposed by the laws of the Requested State.  The method of execution specified in the request shall be followed except to the extent prohibited by the laws of the Requested State.

As stated in the Letter of Submittal to the President of the United States from the United States Department of State, dated October 16, 1991, "the Treaty is designed to be self-executing."  Our federal district courts routinely utilize the "commission" procedure authorized by 28 U.S.C. §1782, the statute governing the provision of assistance for foreign judicial proceedings generally, to fulfill their judicial responsibility under the Treaty in executing Panamanian requests.

1.      Appointment of a commissioner

Section 1782 provides in pertinent part that:

> The district court . . . may direct that the testimony or statement [of a person who resides or is found within the district] be given or the document or other thing be produced, before a person appointed by the court.

A federal district court customarily appoints or "commissions" a person ("commissioner") to collect evidence on behalf of the court and authorizes the commissioner to submit the evidence

2

collected to the requesting foreign court or authority.  With requests for assistance in criminal matters, a court typically appoints an Assistant United States Attorney as commissioner.  However, a court also may commission a foreign authority together with (or in lieu of) an Assistant United States Attorney. See, e.g., In re Letter of Request from the Supreme Court of Hong Kong, 138 F.R.D. 27, 29 (S.D.N.Y. 1991).

Application to a federal district court for appointment of a commissioner to execute a foreign request for judicial assistance is handled ex parte.  In re Letter of Request from the Crown Prosecution Service of the United Kingdom, 870 F.2d 686, 688 (D.C. Cir. 1989); In re Letters Rogatory from the Tokyo District, Tokyo, Japan, 539 F.2d 1216, 1219 (9th Cir. 1976).

2. Establishment of an evidence-collecting procedure

Section 1782 further provides in pertinent part that:

> To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A federal district court empowers a commissioner to collect the evidence using the procedure prescribed by the court.  A court has "complete discretion in prescribing the procedure to be followed." Sen. Rep. No. 1580, 88th Cong., 2d Sess. 1 (1964), reprinted in 1964 U.S. Code Cong. & Admin. News 3782, 3789.  When a court's order fails to specify a procedure by which a commissioner is to collect the evidence, the Federal Rules of Civil Procedure apply.  In re: Letters Rogatory from the Tokyo District Prosecutor's Office, Tokyo, Japan, 16 F.3d 1016 (9th Cir. 1994); Hong Kong, 138 F.R.D. at 32.  However, as Section 1782 makes clear, when a court does specify a procedure other than one in accordance with the Federal Rules of Civil Procedure,

3

the alternative procedure shall apply.  In re Letter of Request from the Government of France, 139 F.R.D. 588, 590-591 (S.D.N.Y. 1991).

     a.     Commissioner's subpoena

The Treaty contemplates that federal district courts will use compulsory measures to execute Republic of Panamanian requests.  The Treaty provides, at Article 9(1):

> A person requested to testify or to produce documentary information or articles in the territory of the Requested State may be compelled to do so in accordance with the requirements of the law of the Requested State.

If a federal district court so orders, a commissioner may use the attached form, entitled "Commissioner's Subpoena," to obtain the requested evidence.  See, e.g., Erato, 2 F.3d at 12-13 (incorporating in pertinent part the district court's order directing the use of commissioner's subpoenas).  The commissioner's subpoena is a creation of neither the Federal Rules of Criminal Procedure nor the Federal Rules of Civil Procedure, but is an order of the court for the production of evidence in accordance with both the Treaty and Section 1782.  See Article 5(1); 28 U.S.C. 1651.  Upon authorization by a court, a commissioner may issue such commissioner's subpoenas as are necessary to execute the request.

     b.     Notice of evidence taking

Inasmuch as grand jury and criminal trial subpoenas are issued without notice to anyone other than the recipients (i.e., no notice to targets, defendants, or third parties), commissioner's subpoenas issued in execution of Republic of Panamanian requests likewise should require no notice to other than the recipients.  Accordingly, a federal district court should authorize a commissioner to collect the evidence requested without notice to any party other than the

recipient of the commissioner's subpoena except to the extent that a Republic of Panamanian request asks for specific notice procedures.[1]

    C.    <u>The Present Request</u>

The instant Treaty Request has been made by the Public Ministry, Office of the First Prosecutor Against Corruption of the Attorney General's Office in Panama. According to the request, Panamanian authorities are investigating the ownership of helicopter HP 1430, which was used by the First Lady in the administration of former President Moscoso. Various government officials claimed that the helicopter was given as a loan in the event that the Presidency needed or requested it and that there was no contract for such a helicopter. However, according to a sales contract from Aeronautical Airmotive Modifications, Inc., Jorge Vasquez Gallego, legal representative of Hanta Corporation, is the owner of the HP 1430. Panama authorities requested that Hanta Corporation provide the sales documents for the HP 1430, but they were never provided.

According to the investigation, the International Insurance Company paid $1,805,000 to Hanta Corporation for the damages incurred in a crash in 2001. Based on these facts and in

---

[1] Historically, United States authorities have executed requests for judicial assistance in criminal matters without notification to actual or potential targets of investigations, or even to parties in proceedings, in order to protect against compromising foreign investigations and proceedings. Furthermore, United States authorities customarily rely on the requesting courts and authorities to provide such notice directly to the relevant parties as foreign law requires. Moreover, requesting courts and authorities routinely request that United States executing authorities follow particular, stated notice procedures when such procedures are necessary or useful under the foreign law or practice.

order to verify if the Panamanian Government used a helicopter which was illegally acquired, Panamanian authorities request information from Bancafe International, Miami, in reference to Jorge Vasquez Gallego's bank account, and copies of the sale contract concerning helicopter HP 1430 from Aeronautical Airmotive Modifications, Inc., located in Miami, Florida.

Accordingly, to execute this request, the government moves this Court to issue the attached Order appointing Assistant United States Attorney Karlyn J. Hunter, as Commissioner, authorizing her to take the actions necessary, including the issuance of Commissioner's subpoenas, to obtain the evidence requested, and to adopt such procedures in receipt of the evidence as are consistent with the intended use thereof in Panama.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By:

KARLYN J. HUNTER
ASSISTANT UNITED STATES ATTORNEY
Court Number A5500809
99 NE 4th Street
Miami, Florida 33132
(305) 961-9085
FAX: (305) 530-7976
E-Mail: Karlyn.Hunter@usdoj.gov

6

COMMISSIONER'S SUBPOENA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TO:  _____
     _____
     _____

I, Commissioner Karlyn J. Hunter, an Assistant United States Attorney for the Southern

District of Florida, acting under the authority of the <u>Treaty between the United States of America and</u>

<u>the Republic of Panama on Mutual Assistance in Criminal Matters</u>, and under Title 28, United States

Code, Section 1782, for the purpose of rendering assistance to Panama, command that you appear

before me in Room 600, at the James Lawrence King Federal building located at 99 NE 4th Street,

Miami, Florida 33132, on _____, 2005, at ____ a.m./p.m., to provide testimony/documents

regarding an alleged violation of the laws of the Republic of Panama, namely, corruption among

other things, and that at the time and place aforesaid you provide the following:

For failure to attend and provide testimony/said documents, you may be deemed guilty of

contempt and liable to penalties under the law.

Dated:

COMMISSIONER KARLYN J. HUNTER
Assistant United States Attorney for the
Southern District of Florida
Telephone 305-961-9085

**REPÚBLICA DE PANAMÁ**
MINISTERIO PÚBLICO
*FISCALÍA PRIMERA ANTICORRUPCIÓN DE LA*
*PROCURADURÍA GENERAL DE LA NACIÓN*

## ASISTENCIA JUDICIAL No. 2

*La   Fiscal   Primera   Anticorrupción   de   la*
*Procuraduría General de la Nación*

**A**: *Departamento de Justicia, Oficina de*
*Asuntos Internacionales 1400 New York ave, N.W.*
*5to. Piso Washington D.C. 20530, Estados Unidos*
*de América. Para las autoridades de MIAMI,*
*FLORIDA.*

### Requiere:

*Se le brinde Asistencia Judicial al amparo*
*de lo dispuesto por el Artículo 1 del Tratado*
*de Asistencia Legal Mutua, suscrito entre*
*Panamá y los Estados Unidos de América, de*
*fecha 11 de abril de 1991.*

*De    conformidad   con   la    legislación*
*contenida en el artículo 389 de la Ley 41 de 2*
*de octubre de 2000, "...El que reciba,*
*deposite, negocio, convierta o transfiera*
*dineros, títulos valores, bienes u otros*
*recursos financieros, a sabiendas de que*
*proceden de actividades relacionadas con el*
*tráfico de drogas, estafa calificada, tráfico*
*ilegal de armas, tráfico de personas,*
*secuestro, extorsión, peculado, corrupción de*
*servidores públicos, actos de terrorismo, robo*
*o tráfico internacional de vehículos, previstas*
*en la Ley penal panameña, con el objeto de*
*ocultar o encubrir su origen ilícito o ayudar a*
*eludir las consecuencias jurídicas de tales*
*hechos punibles, será sancionado con pena de 5*
*a 12 años de prisión y de 100 a 200 días -*
*multa.*

*Además de la Legislación Penal de Panamá*
*(Art. 8 C.P.) consagra que se aplicará la Ley*
*penal panameña a los hechos punibles cometidos*

en el extranjero, entre otros, **por delito Contra la Administración Pública.**

## MOTIVO DE LA SOLICITUD DE ASISTENCIA JUDICIAL

En el sumario que instruye esta Fiscalía en relación a la denuncia suscrita por el Legislador Héctor Alemán, la Procuradora General de la Nación, Encargada, Licenciada Mercedes Araúz de Grimaldo, en providencia fechada 4 de abril de 2001 acoge la misma, por la posible comisión de delito "CONTRA LA ADMINISTRACIÓN PÚBLICA" y solicita se inicie la práctica de todas aquellas diligencias útiles y pertinentes con miras al esclarecimiento de la verdad, así como las circunstancias que sirvan a los fines de agravar o atenuar el ilícito que se investiga.

Sobre los mismos, deben allegarse al sumario que nos ocupa, algunas pruebas que consideramos determinantes y certeras en cuanto a la propiedad legítima del Helicóptero HP-1430, toda vez que en el Memorandum DSP-No 6057-00, dirigido por la Licenciada Gisela M. de Palermo, Secretaria Privada de la Señora Presidenta al señor MAXIMO CARRIZO, Director General del Servicio Aéreo Nacional se dice en su texto que: "...tengo a bien informarle que el helicóptero con matrícula HP-1430, ha sido incorporado a la flota de aeronaves que prestan servicios a la Presidenta de la República."

Que, aunque contamos en el expediente con la declaración jurada de la señora Gisela Moscoso de Palermo, quien se concretó a informar respecto a dicho Memorandum, que no había contrato para prestar servicios de transporte a la Presidencia, que dicho Helicóptero fue ofrecido en calidad de préstamo para aquellas ocasiones en que la Presidencia lo requiriera o lo solicitara; pese a ello la representación legal de la Sociedad Anónima HANTA CORPORATION, no aportó al sumario la documentación de compra-venta del helicóptero que acredite fehacientemente la propiedad que del mismo se dice le pertenece a JORGE VASQUEZ

GALLEGO, ni tampoco se cuenta con la declaración juramentada del mismo, así como tampoco el registro de ingreso de dicha aeronave a territorio panameño, por parte de la Dirección General de Aduana.

En lugar de lo anterior, sí constan en el expediente una serie de circulares y notas vertidas por entidades públicas que informan no han celebrado Contratos u Orden de Compra menor de B/.10,000.00 con el objeto de alquilar el Helicóptero HO-1430, las que fueron aportadas por el Contralor General de la República mediante Nota Núm.3907-Leg de 24 de septiembre de 2001.

En base a los hechos antes expuestos, la Fiscal Primera Anticorrupción de la Procuraduría General de la Nación, ruega a la autoridad de los Estados Unidos de América, se le de la siguiente asistencia judicial:

1. Requerir a BANCAFE INTERNATIONAL MIAMI FLORIDA - ABA0660111389, copia autenticada de la apertura de Cuenta No. 732204020 perteneciente a JORGE VASQUEZ GALLEGO; así como el movimiento que registren los depósitos y retiros de la misma, la cual debía estar operando para la fecha del 30 de marzo de 2001.

2. Es fundamental que nos remita copias claras y autenticadas de la transacción que evidencie la operación de depósito del cheque que se hace mención en la nota cuya copia simple adjuntamos para su mejor comprensión. También se adjunta copia del cheque No. 19950 de la Cía Internacional de Seguros, S.A., de fecha 20 de abril de 2001, pagadero a la orden de HANTA CORPORATION, S.A. por el valor de $ *1,805,000.00 (UN MILLON OCHOCIENTOS CINCO MIL CON 00/100 de CREDICORP BANK Cuenta No. 1-113-1789, en concepto de pago de indemnización del siniestro amparado bajo la póliza 015-01-0000249.

3. Igualmente, gestionar ante la Empresa AERONAUTICAL AIRMOTIVE MODIFICATIONS, INC., cuya dirección es (P.O. Box 524515, Miami, Florida 33152 *Phone/Fax(305)871-0260), para que adjunte copia autenticada de la compra-venta del Helicóptero cuya descripción hacemos al inferior del posterior párrafo.

4. Que la Empresa Aeronautical Airmotive Modifications, Inc. certifique, si los términos de pago que se dice en el documento "PURCHASE AGREEMENT" (lo adjuntamos - escrito en el idioma inglés) fueron hechos en efectivo, a través de cheques, si fue financiado por algún Banco (especifique el Banco y su dirección completa), o cualquier otra transacción bancaria, toda vez que tales pagos, entendemos, forman parte de la compra del HELICÓPTERO con matrícula panameña HP-1430 cuyas generales son las siguientes:

> **Modelo 407 con No. de Serie 53439.**
> **Motor: Modelo Allison 250-C47B,**
> **No. de Serie CAE-847479.**
>
> **ROTOR PRINCIPAL:**
> **P/N 407-015-001-117**
> **S/N A-2145; A-2160; A-2213; A-2082**
>
> **ROTOR DE COLA:**
> **P/N 406-016-100-119**
> **S/N A-2677; A-2737**

5. En caso de que la Empresa AERONAUTICAL AIRMOTIVE MODIFICATIONS, INC. certifique si la compra-venta del helicóptero antes mencionado fue financiada a través de un Banco de la localidad, o de un Banco localizado en otro Estado de los Estados Unidos de América, solicito que a su vez gestione ante el Banco correspondiente para que suministre copia autenticada del número de la cuenta, fecha de apertura de la cuenta, el propietario de la misma y sus generales, así como el movimiento de depósitos y retiros de dicha cuenta.

6. Cualquier otra evidencia que pueda contribuir al esclarecimiento de los hechos.

Es importante, que se pueda demostrar mediante estas diligencias, quién era el propietario del Helicóptero HP 1430, cuyas

generales se establecen en esta *Solicitud de Asistencia*, así como la forma DE PAGO utilizada para su adquisición.

Respetuosamente se solicita que las pruebas requeridas sean autenticadas por la autoridad o funcionario competente.

La Fiscal Primera Anticorrupción se permite ofrecer reciprocidad en casos similares conforme a la ley panameña, a los tratados y costumbres internacionales y hace propicia la oportunidad para manifestarle con antelación nuestro agradecimiento y colaboración.

LIC. CECILIA RAQUEL LÓPEZ
*Fiscal Primera Anticorrupción*
*de la Procuraduría General*
*de la Nación.*

*Panamá 24 de octubre de 2002*

SECRETARIO GENERAL DE LA
PROCURADURIA GENERAL DE LA NACION

CERTIFICA:

Que la firma que antecede y que dice:

Lic. Cecilia Raquel Lopez

es auténtica del funcionario que el día _dos (2)_ de _enero_ del _2002_, ejercía el cargo de _Fiscal Primera Anticorrupción de la Procuraduría General de la Nación_

Panamá, _2_ de _enero_ del _2002_

Secretario General

image reflects quality of original submission

09/21/00   17:03   ☎3C   ☎ 2121        MIAMI        H. ITA europamotions S.A.   ☐002
                                                     Calle 52 y Elvira Mender
                                                     Goloso Vollmis Casuro   01/1 09
                                                                              TEL 2666806
                                                                              25 23 mr.

# Aeronautical Airmotive Modifications, Inc.
P.O. Box 524515, Miami, Florida 33152-4515  *  Phone/Fax: (305) 871-0260

## PURCHASE AGREEMENT

**DESCRIPTION:**  Bell 407, Serial Number 53439

### ACCESSORIES:

Emergency Floats with Flitesteps
Particle Separator
Flight Instrument Group (Less DG)
Rotor Brake
Dual Flight Controls
Heavy Duty Battery
Corporate Interior
Corporate Deluxe (All Leather)
Corporate Headliner with ECU
Corporate Soundproofing
Aircomm Air Conditioning with Dual Forward
    Evaporators
Pre-Flight Kit (Two Folding Steps & Four
    Step/Handles)
Automatic Door Openers (5 Doors)
Cabin Floor Protector
Tail Rotor Pedal Lock-Out Kit
Locking Hinged Fuel Cap
Window Locks
Spacemaker
Winged Zeus Fasteners for Battery Door
Chrome Pitot Tube

### AVIONICS:

Honeywell KCS-55A Compass System with
    NAV Switching
Honeywell KLN-90B GPS System
Honeywell KX-165 NAV/COM/GS System with
    NAV Antenna & Antenna COM
Honeywell KY-196A VHF COM System with
    Cyclic Frequency Selector/Transfer
Honeywell KT-76C Transponder
Honeywell KNI-582 Dual RMI
PS Engineering PMA 7000MS Stereo Audio Panel with
    7 Place Intel VOX ICS with Co-Pilot Footswitch &
    Cyclic Radio Switching
Honeywell KRA-10A Radar Altimeter
Pointer ELT-3000-10 Remote Mount ELT with
    ELT Antenna
Sextant H140 Globe Type 4 Inch Attitude Indicator
SkyForce Skymap Moving Map System
Transcal SS120 Blind Encoder (Coupled to
    Transponder & GPS)
Bose Headset Provisions
Alpine AM/FM Cassette System
Super Nightscanner
Turn & Slip Indicator
Avionics Slant Console Assembly
Avionics Cooling Fan
Remote ID Button on Cyclic for Existing KT-76C
    Transponder
Terra 28/12 Voltage Converter

ES UNA COPIA FOTOSTATICA ↑ EL ORIGINAL

~~Arturo R. [signature]~~

CIA INTERNACIONAL DE SEGUROS, S. A.

**Terms of Sale:**
1. $151,000. Deposit due upon acceptance of the Purchase Agreement.
2. $1,506,700. due upon delivery of "green" helicopter from Bell Helicopter of
   Canada to the modifications facility. Title to the helicopter will be transferred
   at that time.
3. $216,295. is due upon acceptance of completed helicopter from modifications
   facility.

| | |
|---|---|
| Exterior Color: | To Customer Specifications |
| Interior Color: | Corporate Leather - To Customer Specifications |
| Point of Delivery: | Bristol, TN |
| Delivery Date: | Scheduled for October 25th, 2000 |
| Accepted and Confirmed this 8th day of August, 2000 | |
| By: | Ana Fagundo - President |
| Signature: | [signature] |

| | |
|---|---|
| Price: | $1,873,995. |
| Deposit Due: | $ 151,000. |
| Balance: | $1,722,995. |
| Purchaser: | Jorge Vazquez |
| Signature: | |
| Title: | |

Image reflects quality of original submission

09/21/00   17:05   ☎30   2121      MIAMI                                              ☐003

# *Aeronautical Airmotive Modifications, Inc.*

P.O. Box 524515, Miami, Florida 33152-4515 * Phone/Fax: (305) 871-0260

## AMMENDMENT

**In addition** to the Balance Due upon acceptance of the helicopter, as stated in Purchase Agreement dated August 8th, 2000, the following additions, which were approved by your authorized representative, will also be due at that time:

| | | |
|---|---|---|
| 1. | Installation of one ICOM IC-2100H 2 Meter Radio | $  3,995.00 |
| 2. | ChromaLusion Paint (complete helicopter w/stripes) | $  9,500.00 |
| 3. | Bose Series X Headsets (7 each @ $1,145.00 each) | $  8,015.00 |
| 4. | Life Vests (Standard P/N PO723E105P – 7 each @ $50.00 each) | $     350.00 |
| 5. | Bubble Cover for Bell 407 (P/N 407-000 – 2 each @ $594.00 each) | $  1,188.00 |
| | Sub-Total | $ 23,048.00 |

Taking the above enumerated additions into consideration, the final payment will be as follows:

| | |
|---|---|
| Final payment due upon acceptance of completed helicopter | $216,295.00 |
| Plus total amount due for additional items requested | $  23,048.00 |
| NEW Final payment due upon acceptance of completed helicopter | $239,343.00 |

ES FIEL COPIA FOTOSTATICA EL ORIGINAL

The following will be accomplished at no additional charge:

1. Paint Cockpit ECU Ducts All Black
2. Ensure Bose headset provisions are bussed to the Main DC Bus and wired in stereo
3. Install 6 Disc CD Shuttle in Hatrack with Dinky Link IR Remote
4. Upgrade Stereo 12 dc converter to 20 amp unit
5. Add ICS Call Circuit
6. Add Cabin 12 Vdc outlet in cabin hatrack
7. Add Cockpit 12 Vdc outlet to left hand side of the pedestal
8. Add Avionics interface unit for Skymap and provide HIS switching
9. Relocate Cowling 407 logos from Servo Cowling to Engine Intake Cowls
10. Install keyed Ignition Circuit
11. Have all door locks re-keyed

Accepted and Confirmed this 15th day of September, 2000
By:
Ana Fagundo – President
Signature:

Purchaser:  Jorge Vazquez
Signature:
Title:

Cía. Internacional de **PROCESADO** CHEQUE No. 19950
APARTADO 0833-0084 - Plaza Credicorp

PAGUESE A LA ORDEN DE **HANTA CORPORATION, S.A.**

PANAMA, R. DE P.     20     ABRIL     01

$ *1,805,000.00

***UN MILLON OCHOCIENTOS CINCO MIL CON 00/100

DOLARES O BALBOAS

**CREDICORP BANK**
CUENTA No. 1-113-1789

FIRMA AUTORIZADA          FIRMA AUTORIZADA

"⑈0019950" ⑈0001⑈1008⑈ ⑈1131789⑈



ES FIEL COPIA FOTOSTATICA DEL ORIGINAL

CIA. INTERNACIONAL DE SEGUROS, S. A.

FISCALIA PRIMERA ANTICORRUPCION DE LA
PROCURADURIA GENERAL DE LA NACION
ES COPIA DE COPIA AUTENTICA
Panamá 24 de octubre de 20
Secretario (a)

*REPUBLIC OF PANAMA*

*Public Ministry*

*Office of the First Prosecutor Against Corruption*

*ATTORNEY GENERAL'S OFFICE*


*Judicial Assistance Request No 2*


*The First Prosecutor Against Corruption of the Attorney General's Office,*

*To:  The Justice Department, Office of International Affairs, 1400 New York Ave., N. W. 5th floor, Washington, D. C. 20530, United States of America, for the pertinent authorities in MIAMI, FLORIDA,*


*Requests:*

*To provide judicial assistance based on provisions provided for in Article 1 of the Treaty on Mutual Legal Assistance, dated April 11, 1991, entered into between the Republic of Panama and the United States of America.*


*Pursuant to the legislation contained in article 389 of law 41, dated October 2, 2000, which states that "...The one who receives, deposits, trades, converts or transfers moneys, credit*

instruments, properties or other financial resources, knowingly that they proceed from activities connected to drug traffic, aggravated fraud, illegal traffic of weapons, traffic of persons, kidnapping, extortion, peculation, corruption of public servants, terrorism, robbery or international traffic of vehicles, provided in the Panamanian criminal law, with the purpose of concealing its illicit origin or aiding to avoid the juridical consequences of the said punishable acts, will be punished with imprisonment of between 5 and 12 years and 100 to 200 days-fine".

Besides, it states that the Panamanian criminal legislation will be applied to those punishable acts committed abroad, among others, crimes Against the Governmental Administration.

<u>The Request is Based on:</u>

During the preliminary investigation being carried out in this Office, related to the accusation filed by legislator Héctor Alemán for an alleged crime against the governmental administration, the same is received by the Attorney General in charge, Mercedes Araúz de Grimaldo, through resolution dated April 4, 2001, who requests this Office to carry out the pertinent proceedings aimed

at the clarification of the crime as well as of the circumstances that may aggravate or mitigate the illicit action under investigation.

It is necessary to include in the case file some proofs we consider determinant and accurate with regard the legitimate ownership of the HP-1430 helicopter, since in the Memorandum DSP-No 6057-00, sent by Gisela M. de Palermo (private secretary to the Madam President) to MAXIMO CARRIZO, General Director of the National Air Service, it is stated that:  "…I am glad to inform you that the helicopter with registration certificate and letters HP-1430, has been incorporated into the airfleet that gives services to the Madam President of the Republic".

Even though we have in the case file the sworn statement given by Gisela Moscoso de Palermo, who limited herself to inform about the above mentioned memorandum in the sense that the said helicopter has never been  contracted to give transportation services to the Presidency, on the contrary, the same was offered as loan for those occasions in which the Presidency needed it or requested it;  in spite of this, the legal representative of HANTA CORPORATION, did not presented the helicopter' sales

*documents that truly accredits the ownership of the same to JORGE VASQUEZ GALLEGO, neither we have his sworn statement, or the record by the Customs Department of its arrival in Panamanian territory.*

*We do have in the case file, provided by the General Comptroller through letter No 3907-Leg, dated September 24, 2001, a series of communications and letters issued by public entities informing that they have not entered into contracts, or issued purchase orders for less than $10,000.00 with the purpose of renting the helicopter HP-1430.*

*Based on the above mentioned facts, the First Prosecutor Against Corruption of the Attorney General's Office requests the competent authority in the United States of America, to provide us with the following judicial assistance:*

*1. To require from BANCAFE INTERNATIONAL MIAMI FLORIDA - ABA0660111389, authenticated copy of the documents concerning the opening of account No 732204020 registered on the name of JORGE VASQUEZ GALLEGO, as well as the activity registered for deposits and withdrawals as of March 30, 2001.*

2. *It is important that you submit clear and authenticated copies of the operation that proves the deposit of the check mentioned in the letter which copy we enclose. Also enclosed is check No 19950 of Cía. Internacional de Seguros, S.A., dated April 20, 2001, payable to the order of HANTA CORPORATION, S. A., on account of indemnification for the disaster covered under policy 015-01-0000249, in the amount of $1,805,000.00 from bank account No 1-113-17879 at CREDICORP BANK.*

3. *We also request that you take measures to obtain from the corporation AERONAUTICAL AIRMOTIVE MODIFICATIONS, INC., which address is P. O. Box 524515, Miami, Florida 33152 *Phone/Fax (305) 871-0260, an authenticated copy of the sales contract concerning the helicopter which description appears in the lower part of paragraph 4.*

4. *The corporation AERONAUTICAL AIRMOTIVE MODIFICATIONS, INC., shall certify whether the terms of sale referred to in the PURCHASE AGREEMENT (attached herein) were actually met through checks, by means of financing by any Bank (if so, specify which Bank and its address) or by means of any other banking operation, since the we understand that the said*

payments correspond to the purchase of the helicopter with Panamanian registration certificate No HP-1430, which description is the following:

**Model 407, Series 53439**

**Engine: Allison 250-C47B,**

**Series No CAE-847479.**

**MAIN ROTOR:**

**P/N 407-015-001-117**

**S/N A-2145; A-2160; A-2213; A-2082**

**TAIL ROTOR:**

**P/N 406-016-100-119**

**S/N A-2677; A-2737**

5. In the event that the corporation AERONAUTICAL AIRMOTIVE MODIFICATIONS, INC. certifies that the purchase of the above mentioned helicopter was financed through a local bank or a bank located in the United States of America, we request that you take the necessary steps so as to obtain from the said Bank authenticated copy of the account number, date when the said

account was opened, name and personal information of the account holder as well as information regarding the account's activity (deposits and withdrawals).

6. We also request that you provide any other information that may be of help to solve this case.

It is important that we be able to demonstrate, through the above mentioned proceedings, who was the owner of the helicopter HP-1430 described herein, as well as the method of payment used for its acquisition.

We respectfully request that the evidence required be certified by the competent authority or functionary.

The First Prosecutor Against Corruption thanks you for your kindness and cooperation and offers you reciprocity in similar cases according to the Panamanian Law, the treaties and international practice.

> (signed) CECILIA RAQUEL LOPEZ
> First Prosecutor Against Corruption of
> the Attorney General's Office

Panama, October 24, 2001

*(there is a seal that reads: PROCESSED)*

Cia Internacional de Seguros, S.A.            Check No 19950

                          Panama, Rep. of Panama     April 20, 01

PAY TO THE ORDER OF            HANTA CORPORATION, S.A.        $*1,805,000.00

***ONE MILLION EIGHT HUNDRED AND FIVE WITH 00/100

CREDICORP BANK

Account No 1-113-1789

---

*I certify that the above is a true and correct translation into English of the document presented to me in Spanish, to the best of my abilities.*

*Panama, December 31, 2001*

**María Isabel Rodríguez de Boyd**

**Certified Translator - Public Ministry**

MARIA I. RODRIGUEZ P.
INTERPRETE PUBLICO AUTORIZADA
Resol. No. 1256 del 15 de Octubre de 199?

EL SECRETARIO GENERAL DE LA
PROCURADURIA GENERAL DE LA NACION
CERTIFICA:

Que la firma que antecede y que dice:
María Isabel Rodríguez de Boyd
es auténtica del funcionario que el día dos (2)
de Enero del 2002 ejercía el cargo
de Intérprete Público Autorizada de la
Procuraduría General de la Nación

Panamá, 2 de enero del 2002

Secretario General



TREATY WITH PANAMA ON MUTUAL ASSISTANCE IN CRIMINAL MATTERS

TREATY DOC. 102-15

April 11, 1991, Date-Signed

STATUS:

[*1] PENDING: October 24, 1991. Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate.

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES

TRANSMITTING THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE REPUBLIC OF PANAMA ON
MUTUAL ASSISTANCE IN CRIMINAL MATTERS, WITH ANNEXES AND APPENDICES, SIGNED AT PANAMA ON
APRIL 11, 1991

TEXT:
102D CONGRESS

SENATE

LETTER OF TRANSMITTAL

THE WHITE HOUSE, October 24, 1991.
To the Senate of the United States:

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty between the United States of America and the Republic of Panama on Mutual Assistance in Criminal Matters, with Annex and Appendices, signed at Panama on April 11, 1991. I transmit also, for the information of the Senate, the Report of the Department of State with respect to the Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecution [*2] of a wide variety of modern criminals, including members of drug cartels, "white collar criminals," and terrorists. The Treaty is self-executing.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents,

records, and evidence; (3) the execution of requests for searches and seizures; (4) the serving of documents; and (5) the provision of assistance in locating, tracing, immobilizing, seizing and forfeiting proceeds of crime, and restitution to the victims of crime.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

GEORGE BUSH.

LETTER OF SUBMITTAL

DEPARTMENT OF STATE,

Washington, October 16, 1991.
The PRESIDENT,
The White House.

THE PRESIDENT: I have the honor to submit to you the Treaty between the United States of America and the Republic of Panama on Mutual Assistance in Criminal Matters (the "Treaty"), with Annex and Appendices, signed at Panama on April 11, 1991. I recommend that the Treaty be transmitted to the Senate for its advice [*3] and consent to ratification.

The conclusion of this Mutual Assistance Treaty with Panama fulfills a high priority objective of U.S. foreign policy toward Panama. It also satisfies Congressional objectives in combatting drug trafficking and money laundering problems in Panama as outlined in the Conference Report to the Dire Emergency Supplemental Appropriations Act of May 25, 1990. In its Report (Report No. 101-493, 101st Cong., 2nd Sess.), the Conference Committee urged the Administration to link the provision of economic assistance to Panama with the conclusion of an agreement to exchange records on international currency transactions in connection with narcotics investigations, as well as with making steady progress toward signing a mutual legal assistance treaty.

The negotiation of this Treaty involved the highest levels of the Government of Panama. Panama's Legislative Assembly approved the Treaty on July 15, 1991, at a special session convened by President Guillermo Endara exclusively for that purpose. President Endara signed the law ratifying the Treaty on July 22 and it was published in Panama's "Official Gazette" on July 25.

The Treaty covers mutual legal assistance in criminal [*4] matters. In recent years, similar bilateral treaties have entered into force with The Bahamas, Canada, Italy, Mexico, the Netherlands, Switzerland, Turkey and the United Kingdom concerning the Cayman Islands; and others have been concluded and ratified by the United States (but have not yet entered into force) with Belgium, Colombia, Morocco, and Thailand; or concluded and signed with Argentina, Jamaica, Nigeria, Spain and Uruguay. The Treaty contains many provisions similar to those in the other treaties.

The Treaty is designed to be self-executing and will not require implementing legislation. It will enhance our ability to investigate and prosecute drug-related money laundering offenses.

Article 1 provides for assistance in the investigation, prosecution and suppression of offenses (as defined in Article 2) and in all related proceedings, whether criminal, civil or administrative (as defined in Article 2). Assistance under the Treaty will include: provision of documents, records and evidence; executing requests for searches and seizures; immobilizing forfeitable assets; obtaining witness testimony; and other forms of assistance. The article explicitly states that the Treaty is [*5] not intended or designed to provide assistance to private parties or other third parties.

The article further provides that all requests are to be executed in accordance with and subject to the limitations imposed by the laws of the Requested State. This limitation must be read in conjunction with the Annex to the provisions of the Treaty which states that the Treaty provides the necessary legal authority for

its implementation, but that it is not intended to affect the constitutional provisions of either State.

Article 2(1) defines certain key terms under the Treaty. Paragraph 1(a) incorporates into the definition of an "offense", for purposes of the Treaty, a double criminality definition analogous to that contained in modern extradition treaties. The Parties are generally satisfied that most major criminal prosecutions in the United States, except pure tax cases, would qualify for assistance under this definition. Some of those areas in which the double criminality definition might not guarantee the full measure of assistance desired by both Parties are identified in paragraph 1(b), which lists five kinds of crimes for which assistance may be obtained without establishing double [*6] criminality: crimes relating to illegal narcotics trafficking; theft; crimes of violence, and illegal currency or other financial transactions as an integral element contributing to the commission of any offense under the Treaty. As confirmed in the Annex to the Treaty, this last provision is intended to cover crimes involving money laundering or other violations of the currency or financial transaction reporting laws which contribute to drug trafficking or any other offense as defined under either Article 2(1)(a) or 2(1)(b).

Article 2(2) excludes tax matters from the definition of an offense under the Treaty unless it is shown that the monies involved derived from any activity that falls under the definition of an offense under paragraph 1. As reflected in the Annex, the Parties understand this to mean that a criminal tax prosecution involving unreported income acquired through illegal drug trafficking could qualify as an offense for which assistance could be provided.

Article 2(3) defines "proceedings" to include not only criminal proceedings but also proceedings which may be civil or administrative in nature, such as administrative proceedings to forfeit the proceeds of drug trafficking. [*7]

Article 3 sets forth the circumstances under which assistance under the Treaty may be denied. The Requested State may deny requests not in conformity with the Treaty; requests whose execution would prejudice the security or other essential public interests of the Requested State; and requests relating to military or political offenses. The Requested State may also deny a request if the underlying prosecution would be barred by double jeopardy; if there are substantial grounds to believe that the evidence sought would be used to prosecute a person on account of his race, religion, nationality or political opinions; or if there are no reasonable ground to believe that the offense has been committed, or that the evidence sought is located in the Requested State. Before denying assistance, the Central Authority of the Requested State is required to consult with the Central Authority of the Requesting State to consider whether assistance may be given, subject to such conditions it deems necessary. If the Requesting State accepts such conditions, it shall comply with those conditions. The Requested State may also postpone execution of a request or grant it subject to conditions, if execution [*8] would interfere with an ongoing investigation or proceeding in that State. The Requested State is obligated to communicate as soon as possible to the Requesting State its reasons for denying or postponing assistance.

Article 4 defines the Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or a person designated by him. For Panama, the Central Authority is the Minister of Government and Justice or a person designated by him. It provides that requests shall be made directly between the Central Authorities.

Article 5 specifies the information to be contained in the request, including, but not limited to, the subject matter, criminal offenses and nature of the proceeding for which the request is made, a summary of the facts, a description of the evidence, information or other assistance sought, and the purpose for which it is sought. It provides that when use of compulsory process is required in the Requested State, requests shall be in writing, except that in urgent circumstances requests may be made orally, but they must be confirmed in writing "forthwith."

Article 6 obligates the Central Authorities of each Party to [*9] comply promptly with a request or, when appropriate, to transmit a request to the authority having jurisdiction to execute it. That authority is required to use all legal means to execute the request. The article also states that the judicial authorities of the Requested State shall have jurisdiction to issue subpoenas, search warrants or other orders necessary to

execute a request.

Article 7 apportions costs between the two States in executing ordinary requests and provides for consultation when expenses of an extraordinary nature are required to execute a request.

Article 8 establishes procedures for ensuring the confidentiality of requests and their contents and for restricting the use of any information or evidence obtained under the Treaty or derived therefrom.

Article 9 provides that the Requested State, in accordance with its laws, may compel the taking of testimony or production of documents in its territory on behalf of the Requesting State. The article further specifies that any assertion of immunity, incapacity or privilege available under the laws of the Requesting State will be noted for later resolution by the Requesting State but will not preclude the taking of testimony [*10] or the production of documents in the Requested State. The article also requires the Requested State to furnish information about the date and place of the taking of testimony and to permit the presence of any persons specified in the request, such as the accused, counsel for the accused or other interested person. Such person may participate in the taking of testimony subject to the laws of the Requested State. The article specifies a procedure for the authentication of business records produced, using forms appended to the Treaty. In an understanding annexed to the Treaty, the Parties specify the legal requirements under their respective laws for the reporting of currency transaction information and agree that this Article may be used to obtain such information in connection with offenses covered by the Treaty.

Article 10 provides for the voluntary transfer to the Requesting State of a person in custody in the Requested State in order to give testimony, if the Requested State consents. Under this article, a person in custody in the Requesting State may also be voluntarily transferred in custody to the Requested State for purposes of participating in the execution of a request under [*11] Article 9. The article further specifies the requirements for keeping the person in custody, insuring the person's return, and deducting the time spent in custody in one State pursuant to a request made under the Treaty from the time remaining to be served in the other State.

Article 11 provides a mechanism for a Requesting State to invite the voluntary appearance and testimony in that State of a person located in the Requested State. In such a case, the Central Authority of the Requested State is required to invite the person's appearance in a non-compulsory manner, advise the person of the kind and amount of expenses to be reimbursed by the Requesting State, and inform the Requesting State promptly of the person's reply.

Article 12 provides safe conduct to a person temporarily in the Requesting State for testimonial or confrontation purposes pursuant to a request under Article 10 or 11 of the Treaty. Such a person would be immune from service of process, prosecution, detention or restriction of personal liberty for any act which occurred before his or her departure from the Requested State. Such immunity would cease ten days after being notified that his or her presence is no longer [*12] needed.

Article 13 states that the Requested State shall provide the Requesting State with copies of publicly available government records and may, in its discretion, provide any other records or information in the possession of a government office or agency to the same extent and under the same conditions as it would to its own law enforcement and judicial authorities. The article requires official attestation of documents and information, using a form appended to the Treaty.

Article 14 provides a mechanism for one Central Authority to notify the other when it believes the proceeds of a criminal offense are in the territory of the other State and requires the latter to submit the information to its authorities for a determination of appropriate action, to the extent that it has jurisdiction in this regard. The article further provides that, to the extent permitted by their respective laws and this Treaty, the Parties shall assist each other in proceedings relating to the forfeiture of the fruits or instrumentalities of offenses, restitution to the victims of crime, and the collection of fines imposed as sentences in criminal prosecutions.

Article 15 obligates each State to execute [*13] requests for search, seizure and delivery of any item to the

Requesting State in accordance with the laws of the Requested State. The article also establishes a mechanism for ensuring the admissibility of the items produced or seized under the Treaty, including provision of attestations in compliance with a form appended to this Treaty. The article further provides that the rights of third parties to such items shall be duly respected.

Article 16 requires the Requested State to make best efforts to ascertain the location or identity of persons, such as witnesses or suspects, specified in a request.

Article 17 obligates the Requested State to effect service of any document related to a request properly made. This obligation does not extend to subpoenas requiring any person to appear before a tribunal or authority in the Requesting State. Any request for the service of an invitation to appear in the Requesting State must be transmitted at least thirty days in advance of the scheduled appearance. The Requested State is required to return as proof of service a dated receipt signed by the person served or a declaration by the officer effecting service stating the form and date of service. [*14]

Article 18 provides that the Treaty does not impede any assistance or procedure available under other international conventions or arrangements or under the domestic laws of the parties. It further requires the Parties to pursue assistance through the mechanisms established by this Treaty. Finally, this article confirms that no private party or third party may invoke the provisions of this Treaty to exclude evidence or impede the execution of a request.

Article 19 provides that Parties shall consult to develop further specific agreements or arrangements on mutual legal assistance. They may further agree on practical measures to facilitate implementation of this Treaty.

Article 20 provides that the Treaty shall enter into force immediately upon the exchange of the instruments of ratification.

Article 21 provides for termination to be effective six months after written notice of termination is given by one State to the other.

A Technical analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee [*15] on Foreign Relations. The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate as soon as possible.

Respectfully submitted,

LAWRENCE S. EAGLEBURGER.

TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE REPUBLIC OF PANAMA ON MUTUAL ASSISTANCE
IN CRIMINAL MATTERS

The Government of the United States of America and The Government of the Republic of Panama,

Desiring to provide more effective cooperation between the two States in the investigation, prosecution, and suppression of serious crimes, such as narcotics trafficking; and desiring to improve coordination and mutual assistance in law enforcement matters in general;

Have agreed as follows:

ARTICLE 1

OBLIGATION TO ASSIST

1. The Contracting States agree, in accordance with the provisions of this Treaty, to provide mutual assistance in the investigation, prosecution and suppression of offenses and in proceedings connected therewith, as defined in Article 2.

2. Assistance shall include:

(a) taking the testimony or statements of persons;

(b) providing documents, records, and articles of evidence;

(c) executing requests for searches and seizures;

(d) transferring persons in custody for testimonial [*16] purposes;

(e) serving documents;

(f) locating persons;

(g) exchanging information in relation to the investigation, prosecution and suppression of offenses;

(h) immobilizing forfeitable assets; and

(i) any other matter mutually agreed upon by the Contracting States.

3. This Treaty is intended solely for mutual legal assistance between the criminal law enforcement authorities of the Contracting States and is not intended or designed to provide such assistance to private parties or other third parties.

4. All requests under this Treaty shall be executed in accordance with and subject to the limitations imposed by the laws of the Requested State. The method of execution specified in the request shall be followed except to the extent prohibited by the laws of the Requested State.

ARTICLE 2

DEFINITIONS

1. For the purposes of this Treaty, the term "offense" means:

(a) any conduct punishable as a crime under the laws of both the Requesting and Requested States; or

(b) any conduct punishable as a crime under the laws of the Requesting State by one year's imprisonment or more, and which arises from, relates to, results from, or otherwise involves:

(i) illegal narcotics or drug activity [*17] as referred to in Article 36 of the Single Convention on Narcotic Drugs, 1961, as amended by the 1972 Amending Protocol to the Single Convention on Narcotic Drugs, 1961;

(ii) theft;

(iii) a crime of violence;

(iv) fraud or the use of fraud, including the obtaining of money or property by false pretenses, representations, or promises and including the commission of embezzlement, and all conduct which has the effect of defrauding the government, its agencies, or its citizens of the ability to conduct their affairs free from fraud, false

statements and deceit; or

(v) a violation of a law of one of the contracting states relating to currency or other financial transactions as an integral element contributing to the commission of any offense within the meaning of the foregoing provisions of this paragraph.

2. Offense for the purposes of this Treaty does not extend to any matter which relates directly or indirectly to the regulation, including the imposition, calculation and collection of taxes except any matter pertaining to monies shown to be derived from any activity within the provisions of paragraph 1 of the foregoing definition.

3. For the purposes of this Treaty, the term "proceeding" [*18] means the presentation of evidence to:

(a) any court in a criminal trial in the Requesting State (including pre-trial motions);

(b) any grand jury in the United States or any preliminary investigation by the competent authorities of the Republic of Panama;

(c) any court or administrative agency in a hearing which could result in an order imposing forfeiture of fruits or instrumentalities of narcotics trafficking;

(d) in the discretion of the Central Authority of the Requested State any court in a criminal or civil hearing which could result in an order imposing civil or criminal punishment, restitution to any victims of an offense, or the collection of fines imposed as a sentence in a criminal prosecution; or

(e) in the discretion of the Central Authority of the Requested State any administrative agency performing an adjudicatory function in the Requesting State in respect of the imposition of civil or administrative sanctions upon the offender ancillary to proceedings taken under (a), (b) or (d).

ARTICLE 3

LIMITATIONS ON COMPLIANCE

1. The Central Authority of the Requested State may deny a request to the extent that:

(a) execution of the request would prejudice the security [*19] or essential public interests of the Requested State;

(b) the request relates to a political offense;

(c) the evidence requested is to be used for the purpose of a trial of a person on a charge for which that person has been previously convicted or acquitted at a trial in the Requesting State, or was in jeopardy, under the laws of the Requesting State, of being convicted at that trial;

(d) there are substantial grounds leading the Central Authority of the Requested State to believe that compliance would facilitate the prosecution or punishment of the person to whom the request refers on account of his race, religion, nationality or political opinions;

(e) the request does not establish that there are reasonable grounds for believing:

(i) that the criminal offense specified in the request has been committed; and

(ii) that the information sought relates to the offense and is located in the territory of the Requested State; or

(f) the request is not in conformity with the provisions of this Treaty.

2. Before denying any request pursuant to this Article, the Requested State shall determine whether assistance can be given subject to such conditions as it deems necessary. If the Requesting [*20] State accepts assistance subject to these conditions, it shall comply with the conditions.

3. If execution of a request would interfere with ongoing proceedings in the Requested State, execution may be postponed by that State, or made subject to conditions determined necessary by that State after consultation with the Requesting State.

4. The Requested State shall promptly inform the Requesting State of the reason for denying or postponing the execution of a request.

ARTICLE 4

CENTRAL AUTHORITIES

1. A Central Authority shall be established by each Contracting State.

2. For the United States of America, the Central Authority shall be the Attorney General or a person designated by him.

3. For The Republic of Panama, the Central Authority shall be the Minister of Government and Justice or a person designated by him.

4. Requests under this Treaty shall be made by the Central Authority of the Requesting State to the Central Authority of the Requested State.

ARTICLE 5

CONTENTS OF REQUESTS FOR MUTUAL ASSISTANCE

1. Requests shall be submitted in writing where compulsory process is required in the Requested State or where otherwise required by the Requested State. In urgent circumstances, [*21] such requests may be made orally, but shall be confirmed in writing forthwith.

2. The request shall include the following:

(a) the name of the agency or law enforcement authority conducting the proceeding to which the request relates;

(b) the subject matter and nature of the proceeding for the purposes of which the request is made and in particular the criminal offenses for the investigation, prosecution or suppression of which the assistance is requested and a summary of the facts which form the basis thereof;

(c) a description of the evidence or information sought or the acts of assistance to be performed; such description shall specify where possible the time period to which any such evidence or information relates;

(d) the purpose for which the evidence, information, or other assistance is sought; and

(e) an indication of any time limit within which compliance with the request is desired, stating reasons.

3. To the extent necessary and possible, a request shall also include:

(a) available information on the identity and whereabouts of a person to be located;

(b) the identity and location of a person to be served, that person's relationship to the

proceedings, and the manner [*22] in which service is to be made;

(c) the identity and location of persons from whom evidence is sought;

(d) a precise description of the place or person to be searched and of the objects to be seized;

(e) a description of the type and amount of expenses which the Requesting State is willing to assume in the execution of the request; and

(f) any other information which may be brought to the attention of the Requested State to allow it to execute the request.

ARTICLE 6

EXECUTION OF THE REQUEST

1. The Central Authority of the Requested State shall promptly comply with the request or, when appropriate, shall transmit it to the authority having jurisdiction to do so. That authority shall use all legal means within its power to execute the request. The courts of the Requested State shall have jurisdiction in accordance with its laws to issue subpoenas, search warrants, or other process necessary in the execution of the request.

2. When execution of the request requires judicial or administrative action, the request shall be presented to the competent authority by the persons designated by the Central Authority of the Requested State.

ARTICLE 7

COSTS

1. The Requesting State shall assume [*23] all ordinary expenses required to present evidence from the Requested State in the Requesting State, including:

(a) travel and incidental expenses of witnesses travelling to the Requesting State, including those of accompanying officials;

(b) fees of experts; and

(c) fees of counsel appointed with the approval of the Requesting State for a person giving testimony or for a defendant.

2. The Requested State shall assume all ordinary expenses of executing a request within its boundaries, except the following costs which shall be borne by the Requesting State:

(a) fees of experts;

(b) expenses of translation and transcription;

(c) travel and incidental expenses of persons travelling to the Requested State to attend the execution of a request;

(d) reasonable costs of locating, reproducing, and transporting to the Central Authority of the Requesting State documents or records specified in a request; and

(e) costs of stenographic reports requested by the Central Authority of the Requesting State, other than reports prepared by a salaried government employee.

3. If during the execution of the request it becomes apparent that expenses of an extraordinary nature are required to fulfill [*24] the request, the Parties shall consult to determine the terms and conditions under

which the execution of the request may continue.

4. The Parties shall agree, pursuant to Article 19, on practical measures as appropriate for the reporting and payment of costs in conformity with this Article.

5. A witness who appears in the territory of the Requesting State pursuant to Article 11 shall be entitled to the same fees and allowances ordinarily accorded to a witness in the territory of the Requesting State.

6. A witness who appears in the territory of the Requested State pursuant to Article 9 shall be entitled to such fees and allowances as shall be agreed between the Central Authorities.

## ARTICLE 8

### LIMITATIONS ON USE

1. The Requesting State shall not use any information or evidence obtained under this Treaty, nor any information derived therefrom, for purposes other than those stated in the request without the prior consent of the Requested State.

2. Unless otherwise agreed by both Central Authorities, information or evidence furnished under this Treaty shall be kept confidential, except to the extent that the information or evidence is needed for investigations or proceedings forming part [*25] of the prosecution of a criminal offense described in the request.

3. If the request cannot be executed without breaching the required confidentiality, the Requested State shall so inform the Requesting State which shall then determine whether the request should nevertheless be executed.

4. Information or evidence made public in the Requesting State in a trial resulting from the proceedings described in the request may be used only for the following additional purposes:

(a) where a trial results in conviction for any criminal offense within the scope of this Treaty, for any purpose against the person(s) convicted;

(b) whether or not a trial results in the conviction of any person, in the prosecution of any person for any criminal offense within the scope of this Treaty; and

(c) in civil or administrative proceedings, only if and to the extent that such proceedings relate to:

(i) the recovery of the unlawful proceeds of a criminal offense within the scope of this Treaty from a person who has knowingly received them;

(ii) the collection of tax or enforcement of tax penalties resulting from the knowing receipt of the unlawful proceeds of an offense within the meaning of paragraph [*26] 1 of Article 2 of this Treaty; or

(iii) the recovery in rem of the unlawful proceeds or instrumentalities of an offense referred to in the preceding subparagraph (ii).

## ARTICLE 9

### TESTIMONY IN THE REQUESTED STATE

1. A person requested to testify or to produce documentary information or articles in the territory of the Requested State may be compelled to do so in accordance with the requirements of the law of the Requested State.

2. If the person testifying or required to produce documents in the Requested State asserts a claim of

immunity, incapacity, or privilege under the laws of the Requesting State, his testimony or the production of documents shall nonetheless be taken or made, as the case may be, and the claim made known to the Requesting State for resolution by the authorities of the Requesting State.

3. The Requested State shall furnish information in advance about the date and place of the taking of testimony of the witness.

4. The Requested State shall authorize the presence of such persons as specified in the request during the execution of the request and, subject to the laws of the Requested State, allow such to question the person whose testimony is sought.

5. Business [*27] records produced under this Article shall be authenticated by the person in charge of maintaining them through the use of Form A(1) or Form A(2) appended to this Treaty, which shall be executed under oath. No further certification shall be required. Documents authenticated as provided by this paragraph shall be admissible in evidence in proof of the truth of the matter set forth therein.

ARTICLE 10

TRANSFERRING PERSONS IN CUSTODY FOR TESTIMONIAL PURPOSES

1. A person in custody in the Requested State who is needed as a witness in connection with the execution of a request in the Requesting State shall be transported to that State if the person consents and if the Requested State has no reasonable basis to deny the request.

2. A person in the custody of the Requesting State whose presence in the territory of the Requested State is needed in connection with the execution of a request under this Treaty may be transported to the territory of the Requested State if the person and both States consent.

3. For the purpose of this Article:

(a) the receiving State shall be responsible for the safety and health of the person transferred and have the authority and obligation to keep the person [*28] transferred in custody unless otherwise authorized by the sending State;

(b) the receiving State shall return the person transferred to the custody of the sending State as soon as circumstances permit or otherwise agreed and in any event no later than the date upon which he would have been released from custody in the territory of the sending State;

(c) the receiving State shall not require the sending State to initiate extradition proceedings; and

(d) the person transferred shall receive credit for the service of the sentence imposed in the sending State for time served in the custody of the receiving State.

ARTICLE 11

TESTIMONY IN THE REQUESTING STATE

When the appearance of a person who is in the territory of the Requested State is needed in the territory of the Requesting State for the purpose of execution of a request under this Treaty, the Central Authority of the Requesting State may request that the Central Authority of the other State invite the person to appear before the appropriate authority in the territory of the Requesting State. The person required shall be told the kind and amount of expenses which the Requesting State has indicated will be paid to him. The response [*29] of the person shall be communicated promptly to the Central Authority of the Requesting State. Such a person shall be under no compulsion to accept such an invitation.

ARTICLE 12

## SAFE CONDUCT

1. No person in the territory of the Requesting State to testify in pursuance of the execution of a request shall be subject to service of process or prosecution or suit or be detained or subjected to any restriction of personal liberty by reason of any acts which preceded his departure from the Requested State.

2. The safe conduct provided for in this Article shall cease if, ten days after the person appearing has been notified that his presence is no longer required, that person being free to leave, has not left the Requesting State; or, having left the Requesting State, has returned.

## ARTICLE 13

## PROVIDING RECORDS OF GOVERNMENT AGENCIES

1. The Requested State shall provide copies of publicly available records of a government agency or of its judicial department.

2. The Requested State may provide copies of records or information in the possession of a government office or agency, but not publicly available, to the same extent and under the same conditions as it would to its own law enforcement [*30] or judicial authorities. The Requested State may in its discretion deny the request entirely or in part.

3. Documents provided under this Article shall be attested by the official in charge of maintaining them through the use of Form B, appended to this Treaty. No further certification shall be required. Documents attested under this paragraph shall be admissible evidence in proof of the truth of the matters set forth therein.

## ARTICLE 14

## ASSISTING IN FORFEITURE PROCEEDINGS

1. If the Central Authority of one State becomes aware of fruits or instrumentalities of offenses located in the other State which may be forfeitable or otherwise subject to seizure under the laws of that State related to serious offenses such as narcotics trafficking, it may so inform the Central Authority of the other State. If that other State has jurisdiction in this regard, it shall present this information to its authorities for a determination as to whether any action is appropriate. These authorities shall issue their decision in accordance with the laws of their country, and shall, through their Central Authority, report to the other State on the action taken.

2. The Contracting States shall assist each [*31] other to the extent permitted by their respective laws and this Treaty in proceedings relating to the forfeiture of the fruits or instrumentalities of offenses, restitution to the victims of crime, and the collection of fines imposed as sentences in criminal prosecutions.

## ARTICLE 15

## SEARCH AND SEIZURE

1. A request for the search, seizure and delivery of any article to the Requesting State shall be executed if it includes the information justifying such action under the laws of the Requested State.

2. Every official of the Requested State who has custody of seized articles shall certify, through the use of Form C appended to this Treaty, the continuity of custody, the identity of the article, and the integrity of its condition. No further certification shall be required. The certificates shall be admissible in evidence in the Requesting State as proof of the truth of the matters set forth therein.

3. The Requested State shall not be obliged to provide any item seized to the Requesting State unless that State has agreed to such terms and conditions as may be required by the Requested State to protect third

party interests in the item to be transferred.

ARTICLE 16

LOCATION AND IDENTITY [*32] OF PERSONS

1. The Requested State shall make best efforts to ascertain the location and identity of persons specified in a request and who are needed in connection with the investigation, prosecution or suppression of an offense in the Requesting State.

2. The Requested State shall communicate as soon as possible the results of its inquiries to the Requesting State.

ARTICLE 17

SERVING DOCUMENTS

1. The Requested State shall effect service of any document relating to or forming part of any request for assistance properly made under the provisions of this Treaty transmitted to it for this purpose by the Requesting State; provided that the Requested State shall not be obliged to serve any subpoena or other process requiring the attendance of any person before any authority or tribunal in the Requesting State.

2. Unless otherwise agreed, any request for the service of a document inviting the appearance of a person before an authority in the Requesting State shall be transmitted at least thirty days prior to the date of the scheduled appearance.

3. The Requested State shall return as proof of service a receipt signed by the person served or a declaration signed by the officer making service, [*33] specifying the form and date of service.

ARTICLE 18

COMPATIBILITY WITH OTHER TREATIES AND INTERNAL LAWS

1. Assistance and procedures provided by this Treaty shall not prevent either of the Contracting States from granting assistance to the other Party in accordance with the provisions of other international agreements to which it may be a party or in accordance with the provisions of its internal laws.

2. Subject to the terms of paragraph 1, a Party needing assistance as provided in Article 1 in the investigation, prosecution or suppression of an offense as defined in Article 2 shall request assistance pursuant to this Treaty.

3. No private party or other third party may invoke the provisions of this Treaty to exclude any evidence hereunder or to impede the execution of a request.

ARTICLE 19

IMPROVEMENT OF ASSISTANCE

1. The Parties agree to consult as appropriate to develop other specific agreements or arrangements, formal or informal, on mutual legal assistance.

2. The Parties may agree on such practical measures as may be necessary to facilitate the implementation of this Treaty.

ARTICLE 20

RATIFICATION AND ENTRY INTO FORCE

1. This Treaty shall be ratified and the instruments of [*34] ratification shall be exchanged at Washington, D.C. as soon as possible.

2. This Treaty shall enter into force upon the exchange of instruments of ratification.

ARTICLE 21

DENUNCIATION

Either Contracting State may terminate this Treaty by means of written notice to the other State. Termination shall take effect six months following the date of notification.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE at Panama, Republic of Panama, in duplicate, in the English and Spanish languages, both texts being equally authentic, this eleventh day of April, 1991.

FOR THE UNITED STATES OF AMERICA:

FOR THE REPUBLIC OF PANAMA:

Portion to be signed by competent official of the Government of the Republic of Panama:

I, (name of competent official) certify that (name of person who appeared) appeared before me on (date) in Panama City, Republic of Panama and signed the foregoing certification in my presence. Likewise, I declare that I warned him that under the provisions of article 355 of the Penal Code, the person who signed the foregoing certification knowing that it contained a falsehood is subject to penal sanctions [*35] for said testimony.

(Signature) ___

(Date) ___

APPENDICES:
ANNEX

The following paragraphs confirm understandings of the Government of the United States of America and the Government of the Republic of Panama regarding the Treaty on Mutual Legal Assistance in Criminal Matters.

1. (a) Article (2)(1)(b) lists the categories of offenses covered by such paragraphs:

(i) Crimes relating to illegal narcotics trafficking. The traffic in drugs is a serious problem to both countries, and it is intended that this Treaty will be a valuable tool to enhance investigations aimed at halting these offenses. Both the United States and Panama are parties to the Single Convention On Narcotic Drugs, 1961 and the 1972 Protocol Amending the Single 1961 Convention on Narcotic Drugs, which oblige the signatories to provide assistance to each other in narcotics investigations. The obligation undertaken here is consistent with that set out in these multilateral conventions, since neither the Single Convention nor the Amending Protocol conditions the obligation to provide assistance on double criminality;

(ii) Theft;

(iii) Crimes of violence, such as bank robbery, extortion, or terrorism-related crimes;

(iv) [*36] Fraud of various kinds, including the obtaining of money or property by false pretenses, and including embezzlement and fraud upon the Government. This subparagraph would include mail or wire fraud, those securities laws violations involving fraud or fraudulently obtained profits; however, the subparagraph would not include tax evasion cases not related to other offenses covered by this Treaty; and

(v) Violations of the laws involving currency or other financial transactions which contributed as an integral element to the commission of one of the crimes described above.

(b) Article (2)(2) permits denial of assistance when the matter is one of which relates directly or indirectly to the regulation of taxes, including the imposition, calculation, and collection of taxes. The subparagraph specifically notes that exceptions to this restriction exist where the monies involved in the tax matter were derived from any activity covered by Article 2(1)(a) or 2(1)(b). For example, a criminal tax prosecution in the United States involving unreported income acquired through illegal drug trafficking could qualify as an offense for which assistance could be provided under the Treaty.

2. [*37] Article 9 of the Treaty may be used by either Contracting State as a means to obtain currency transaction information from the other Contracting State in connection with offenses covered by this Treaty.

(a) Currency transaction information includes information regarding transactions in currency in excess of $ 10,000 US or its equivalent in foreign currency by, through or to a financial institution on its own behalf or on behalf of a customer which financial institutions within the territory of each Contracting State are obligated by national laws and regulations to record and maintain for a period of no less than five years. Such information involves, at a minimum:

(i) the name, address, date of birth, business and occupation of the person or persons conducting the transaction; information regarding the name and address of such person shall be verified by requiring the production of reliable identity documentation;

(ii) whether the transaction is being conducted on behalf of a person or persons other than the person or persons conducting the transaction, and if so the name, address, business and occupation of the person or persons on whose behalf the transaction is being [*38] conducted;

(iii) the amount, date and nature of the transaction, including the account numbers and, if possible, the type of account; and

(iv) the account or accounts affected by the transaction, including the account numbers and, if possible, the type of account; and

(v) the name, address, identification number (if applicable), and type of financial institution where the transaction was conducted.

(b) For the United States, at the present time, the requirement to report currency transaction information derives from the Currency and Foreign Transactions Reporting Act (31 U.S.C. 53, et seq), its implementing regulations (31 C.F.R. Part 103) and forms (I.R.S. Form 4789).

(c) For the Republic of Panama, at the present time, the requirement to record currency transaction information derives from Decreto de Cabinete No. 41 del 13 de febrero de 1990 POR EL CUAL SE DICTAN MEDIDAS ADMINISTRATIVAS PARA PREVENCION Y SANCION DE OPERACIONES BANCARIAS CON FONDOS PROVENIENTES DE ACTIVIDADES ILICITAS RELACIONADAS CON DROGAS Y SE OTORGAN FACULTADES A LA COMISION BANCARIA NACIONAL PARA TAL EFECTO, National Banking Commission Acuerdo No. 5-90; dated March 19, 1990 POR EL CUAL SE ADOPTA EL [*39] REGLAMENTO PARA PREVENCION DE OPERACIONES EN EFECTIVO CON O SOBRE FONDOS PROVENIENTES DE ACTIVIDADES ILICITAS RELACIONADAS CON DROGAS; National Banking Commission Acuerdo No. 1-91 POR EL CUAL SE ADOPTA EL REGLAMENTO PARA PREVENCION DE OPERACIONES EN CHEQUES (DE GERENCIA, DE VIAJEROS U OTROS) Y ORDENES DE PAGO LIBRADOS AL POR TADOR, CON ENDOSO EN BLANCO Y EXPEDIDOS EN UNA MISMA FECHA O EN FECHAS CERCANAS Y/O POR UN MISMO LIBRADOR O LIBRADORES DE LA MISMA PLAZA CON O SOBRE FONDOS PROVENIENTES DE ACTIVIDADES ILICITAS RELACIONADAS CON DROGAS; dated January 15, 1991, forms CBN-EFE-P, CBN-EFE-C, CBN-EFE-H and CBN-DOC and other forms and records required to be maintained by the National Banking Commission.

3. This Treaty provides the necessary legal authority to carry out and fully implement all of its provisions to their fullest scope (to the extent that this legal authority does not already exist) for all competent authorities within the Governments of the respective Contracting States; provided however, that as indicated in Article 1(4) nothing herein is intended to affect the constitutional provisions of either State.

APPENDIX

Form A(1)
ROP

Certificate of Authenticity of Business [*40] Records

Portion to be signed by authorized person:

I, , knowing that I am subject to penal sanction for false testimony, declare the following:

1. That I am employed by (name of employer) , a company which is (describe type of business).

2. That I am employed as (title) .

3. That I am duly authorized and qualified to make this declaration by virtue of my employment.

4. I hereby certify that the records attached to this declaration are the original or true copies of the records that:

a. were made by a person, (or based on information transmitted by a person) with knowledge of the facts or matters referred to in said documents, at the time or near the time at which said facts or matters occurred;

b. that such records were kept in the course of a regularly conducted business activity;

c. that the business activity made such records as a regular business practice; and

d. if such record is not the original, such record is a duplicate of the original.

5. The originals or duplicates of these records are maintained in (location).

(Signature) ___

(Date) ___

Form A(2)
USA

Certificate of Authenticity of Business Records

I, (name) , knowing that I am subject to penal sanction for [*41] false testimony, declare the following:

1. That I am employed by (name of employer) , a company which is (describe type of business).

2. That I am employed as (title) .

3. That I am duly authorized and qualified to make this declaration by virtue of my employment.

4. I hereby certify that the records attached to this declaration are the original or true copies of the records that:

a. were made by a person (or based on information transmitted by a person) with knowledge of the facts or matters referred to in said documents at the time or near the time at which said facts or matters occurred;

b. that such records were kept in the course of a regularly conducted business activity;

c. that the business activity made such records as a regular business practice; and

d. if such record is not the original, such record is a duplicate of the original.

5. The originals or duplicates of these records are maintained in (location).

(Signature) ___

(Date) ___

Form B

Attestation of Authenticity of Documents

I, (name), knowing that any false testimony on my part subjects me to criminal sanction, ATTEST:

1. That I hold the position of (position), at (name of the institution and Government [*42] to which it belongs);

2. That as part of the functions of my position I am authorized by the laws of (State to which it belongs) to attest that the documents attached hereto and which I describe below are authentic copies of the original official documents which are filed at (name of the respective official entity and government to which it belongs), which is a governmental agency or entity of the government of (name of country).

Description of the Documents:

(Signature) ___

(Title) ___

(Date) ___

Form C

Attestation of Seized Articles

I, (name), knowing that any false testimony on my part subjects me to criminal sanctions, ATTEST:

1. That I hold the position of (position), at (name of the institution and Government to which it belongs);

2. That I have received custody of the article(s) mentioned below from (name and position of the person, date, and place);

3. That I have transferred custody of said article(s) to (name and position of the person, date and place);

4. That at this time the article(s) are in the same condition as when I received them or with the changes listed below.

Description of the Articles.

Changes in condition while in my custody:

(Signature) ___

(Position) [*43] ___

(Date) ___

---

*The Office of International Affairs* Department of Justice * 1301 New York Ave., NW * Suite 900 * Washington, D.C. 20005*

*Last updated by usdoj-crm/mis*
*January 10, 2001*